Good morning, Your Honor. Good morning, Your Honor. Larry Gabriel on behalf of Ken Henry, the liquidating trustee. As the Court knows, there's two appeals, 10 meetings and cross appeals. We have talked previously, and subject to the Court's permission, we set out a schedule for the appearances of the parties that we'd like to recommend to the Court. Yeah, well, we're given each side 30 minutes. I understand. In that regard, in order to divide it up, we've at least agreed among ourselves that if Lehman would go first, they would take the first 20 minutes. Okay. Followed by the trustee, myself, who would take 10 minutes, reserving five. The class would then address the Court for 12 minutes, reserving three. Lehman would come back again for 10 minutes. I would come back as the trustee for five minutes, and the class for three. What's that add up to? Pardon me? What's that add up to? It adds up to 30 minutes or five. 30 minutes. Okay. All right. Oh, you're just making that announcement. All right. Good morning. May I start? You know, one of the problems, you might, I don't know how you're going to do this, but see, we tape all this, and we don't have a rolling mic, do we? Huh? Good morning. Maybe if you brought it a little closer. Do you have a copy of those? You can't move very far from the microphone or otherwise we're going to lose you, so. See, that's a problem here. But if you're not going to be actually standing next to the board much, we're probably okay. All right. Good morning. I'm Helen Duncan. I represent Lehman Brothers in these consolidated appeals. I will use 20 of my 30 allotted minutes and reserve 10. There are many errors that have been asserted by the various parties in these three consolidated appeals. However, if the court sets aside the jury's finding on the aiding and abetting, it will eliminate all of the appeals and the cross appeals and render various issues moot. So let me begin there. This is a case in which the class seeks to hold a corporation, a publicly held corporation, liable for aiding and abetting fraud of another publicly held corporation. Lehman Brothers is charged with financing the business of a mortgage lender in Orange County that was in business for more than 10 years. And the conduct that is alleged is the conduct of financing. They're providing underwriting services and a warehouse line of credit. And the chart that I have provided the court. You said a something line of credit. Oh, a warehouse line of credit. A warehouse line of credit. Basically, what the chart will show is there are two transactions. One transaction are the borrowers are people who want to refinance their home mortgages would go to First Alliance Mortgage, which we've shortened up to be FAMCO. And they would get a mortgage where they would refinance. So they would borrow money and they got money and they used it for whatever to remodel their kitchen or get a new car or whatever they were going to do with it. And there's no doubt about that. They got that. Those were real mortgages. Those mortgages were then used by First Alliance when it borrowed money from Lehman Brothers. So it had a line of credit from its lender, Lehman Brothers, and it used the mortgages as collateral on the line of credit with Lehman Brothers. On a quarterly basis, however, it would take those mortgages and it would sell them. It would liquidate them to convert this long-term cash right to receive these payments into a present-day asset. So it would sell them. Lehman Brothers. Lehman Brothers would be the underwriter that would help FAMCO sell its assets, its rights to these mortgages. It held these mortgages that it owned. So it would be like your real estate broker. Lehman would help FAMCO sell its mortgages. So it would sell it in what's called the securitization. So they would bundle up the mortgages and they would sell them to the public through the securitization. When they sold them, the mortgages would be released from the credit line. The credit line would be paid off. The excess would then go back to First Alliance and it would have the cash or, you know, the benefit of liquidating its assets. So this was the transaction that was the same that Lehman used, whether it was First Alliance mortgage or any of its other businesses. There was nothing unusual about it. There was nothing atypical about it. This is the way the business ran. So that was the transaction and that was the way the mortgages and the money flowed between Lehman Brothers, First Alliance, the public, and the borrowers. The borrowers are the class of plaintiffs in this case. The fraud that is alleged occurred and what is alleged and it's in the plaintiff's brief, the fraud is the appraisers and loan officers at First Alliance orally deceived through deceptive sales practices the borrowers and supposedly fraudulently induced them into taking out loans that were more expensive than they thought they were getting. So when they received all of the written loan documents that accurately reflected the loan terms, they were deceived because of oral representations made to them by or deceptive oral practices by the loan officers, FAMCO's loan officers or FAMCO's appraisers. So that transaction is at the closing table, if you will, when the mortgages are being refinanced by FAMCO. And FAMCO operated in, I believe, 17 states around the United States. So this is happening in their offices around the United States. Lehman is not alleged nor is there any evidence that Lehman has any contact with any borrower, any contact with this mortgage transaction, any contact with the sale, any representation to a borrower, any involvement with training any loan officer, any knowledge of this, excuse me, any involvement with this appraiser. So if you... The word knowledge may be the key. It depends how you define contact and how you define knowledge. I mean, I understand what plaintiff's allegations are and I understand what they're not alleging. What plaintiff's allegations are was concluded by the district court to be a basis for aiding and abetting. And I think that's what you're going to need to address. Let me address what I think is the cleanest and most direct way to go here. And that is substantial assistance. Substantial assistance is an essential component in an aiding and abetting claim. Because in an aiding and abetting claim, you have to have someone who provides substantial assistance. That means you have to participate in a fraud. And in the cases of... Well, again, that turns on the definition of participate. I mean, suppose I hand Judge Vibey a gun and tell him to go out and shoot somebody. He goes out and shoots somebody. Now, I didn't shoot somebody. No, but you did. I handed him the gun. You substantially assisted in the participation of that fraud. That's what's required. And that's... In this case, the allegation is that layman handed FAMCO the money that permitted its business to go forward. The money... And did so knowing... Again, this is the allegation and the apparent conclusion of the jury in the court. Did so knowing how FAMCO was going to use that. And I apologize for interrupting. The money, and you bring me to an excellent point, which is proximate cause. The money did not cause the fraud. Money alone, and the cases are clear on that. Money alone. Because that's what banks do. If the rule of law is that by financing a company in need, which is what lenders do, they provide financing to companies that need financing. If that's all you need to be found liable for aiding and abetting fraud, then that's basically strict liability. So if you have... Well, you've left a piece out there. The question is, if you know how the money is going to be used, if you know this money is for a loan-sharping operation, if you know it's going to be running numbers or a drug ring or something, at some level, that knowledge brings you into the circle. Now, the allegation here is that layman had sufficient actual knowledge to be brought into the circle for aiding and abetting liability.  It's because you're a lender knowing accurately how the money is going to be used and misused. I think that every case, I don't think, I know that every case in which a bank has been found liable for aiding and abetting, the substantial assistance requirement has required misconduct. And so there is no misconduct. And what the Court is suggesting in your questions right now is that you can be found liable for fraud by doing nothing more than legal acts based on knowledge. And I don't think... I could lend my gun to Judge Bybee, and that's not unlawful. He goes out and shoots somebody, and that's what I wanted him to do. Then what I did was unlawful. So to look at the act of lending money as if it's immune, that no matter how the money gets used and no matter what knowledge you have about how the money gets used, that somehow just the act of lending money is a safe harbor, that seems to me unlikely. But here, the... How do you distinguish here if none of the conduct that Lehman does is different? If you take out SAMCO and the fraud and put in any other, you know, any bank, any legitimate bank, and you change nothing else about what Lehman has done, nothing else about its conduct is changed. You've just changed out who it's giving the money to. Why is it liable for fraud if the conduct... It's liable for fraud. It's liable for aiding and abetting fraud. And the key is, and again I'm saying this is what the argument is, and what the jury apparently found, is that Lehman did that knowing how the money was being used, knowing the lending practices and having actual knowledge of the allegedly fraudulent lending practices. What I'm trying to distinguish here is it seems to me you're making an argument that lending is legal, so it doesn't matter what you lend to as long as you're not actually participating in what SAMCO or the borrower does. And I'm suggesting that at some level, in my understanding of California law on aiding and abetting, turns on knowledge. If you know how it's going to be used, then you can be held liable for aiding and abetting. I disagree. That doesn't work, then. If Lehman knew that SAMCO was, to use an expression we heard, loan sharky, no question about it. And Lehman kept lending the money and then getting a return on it, then Lehman, in your view, would not see aiding and abetting. I think that what aiding and abetting requires is misconduct. I think you can't, there are separate elements. And I think that what you're doing is you're merging and you're eliminating, and what you're saying is there's only one element, and it's knowledge. Counsel, is it misconduct, then, to loan money to an institution that is engaging in some kind of a fraud? Well, I don't think so. Because if you do that, based on what has happened in this case, in other words... Let me rephrase the question. Let me refine the question. Is it misconduct for a lending institution to lend money to another institution that it knows is using the money to perpetrate fraud? If there is actual knowledge and there is some holding out, in other words, you are making a representation, you are lending your credibility, you are cloaking that primary with your respectability. That's what the case is required. There is not a single case in which a bank has done nothing more than lending, in which a bank has been held liable. Let's talk about the bank knowing that the institution to which it is lending the money is using that money for an illegal purpose. Yes, there is not a single case. Is there a single piece that says to the contrary, that is, without that piece, that the act of lending, no matter what you know about how the money is going to be used, the act of lending insulates you or you are immune from being liable? Well, there is nothing that says it insulates you, but what you are doing... But you can't be liable for mere lending with knowledge. Yes. What authority supports... So with knowledge, I'll be honest, I haven't found a case that is authoritative that speaks clearly to the situation from either side. I think we are someplace in the midst of the cases that are out there which speak to different factual situations. I'm having trouble understanding what it is... If you concede for the moment there was knowledge, knowledge of what was being done, and I understand you don't concede that, but it seems to me the argument you're trying to make has to accept knowledge because you're saying you need misconduct beyond knowledge, and I don't understand where that comes from. It seems to me knowledge by itself under California law can be sufficient. Well, then you eviscerate... I mean, if you eliminate... Then what does substantial assistance mean? Well, what if you knew that FAMCO was in the business of manufacturing methamphetamine? You know, that's our business. We need money. All right, so we loan you the money. And then FAMCO manufactures and sells us the illegal product. And would the lender not be considered as an aider and abetter? There is a proximate cause there because the drug cannot be made without the money, right? Well, you can't lend. Well, of course you can lend. You can make loans without the fraud. But you can't make loans without the money. The substantial assistance is alleged to be that without layman's warehouse line of credit, to the point the credential walks away, FAMCO's out of business. Well, I understand that that is the argument. But the evidence is that... I mean, that is their argument. But the problem you have is that the court's argument is, again, eviscerating one of the elements. It's taking the money as being the substantial assistance. But you have to... All right, but even that, in order for it to be substantial, what the law says is that it has to be the proximate cause. In order to be substantial... Proximate cause of what? Of the harm. It isn't the money that is... Are you suggesting then that financing the methamphetamine ring is not the proximate cause? I mean, the bank's not producing the meth, so the bank's off the hook. I don't think that's what the law suggests. Why can't money be substantial assistance? Because if you're the bankroll of an operation, certainly there are a lot of criminal conspiracies where the bankroll is held criminally culpable. So why is it that it can't be held civilly liable for aiding and abetting if, in fact, you are bankrolling an operation that you know is doing something improper? So let's talk about knowledge then for the moment. Then you have a case here where all you have to do is find a company that's been accused and has had lawsuits. And so what this case would stand for, if the class is right, is you find a company that has had lawsuits against it, and so any lender that does due diligence, and so it could be Microsoft... And produces a due diligence report where the lender's own employee appears to conclude that, in fact, the operation is a house of cards and that they're engaged in fraudulent lending practices. Where it says there is no fraud in the operations. He says there is no fraud in the operations. He doesn't like the business. It displeases him. It personally offends him. But he says there is no fraud in the operations. He may find it personally distasteful. As many of us who listen, the employee, Mr. Hibbert, the Lehman employee, who evaluated it in 1995 and Lehman doesn't even lend until 1999. But, and there are many who may not like to lend or, you know, there are businesses that we personally may not find wise or personally tasteful. I mean, we in Southern California hear the radio ads for these kinds of businesses all the time. But it doesn't mean that they're illegal. I often wonder where is this all money coming from? So people, Lehman runs, they run a, they run an investment, they get money from people that have money and they invest it for them, right? And they get a return. They're like financial advisors. They have, they can. They're not using their own money, are they? Yes, sometimes. Okay, but they're also using money that people deposit with them. Sometimes. I don't know. Well, they're not a retail. I'm trying to learn it. No, they're not a retail. I'm trying to learn it so I can get in the business. You're not helping me. I think what the court is trying to say is they're not like a Merrill Lynch where you have individual investors. They don't have a retail business side. No, they have a wholesale business. They have institutional investors. Institutional investors. Right. They have the people with the big money. But mostly their business is being underwriters for securitization. Right, I know that. Okay. But the point is, my point is that. If somebody makes a deal, you know, go to FAMCO, and FAMCO I'm sure is saying, I mean, I'm just speculating. Oh, you know, this is, you know, we're fine. You know, Lehman Brothers, they're the ones that, they're our partners. They're the ones that are supplying the money. Well, now we have, that is. That's what they've got. But that's not what happened. The investors, or excuse me, borrowers never knew about Lehman. Lehman was never known. It was never used as part of the operation. Until it was sued, the borrowers didn't even know it was included. So, it wasn't like FAMCO was using it as a, to cloak itself. A sales tool. It wasn't a sales tool. It never made representations. That's what I'm saying. Well, I'm glad to find that out. Well, that's what I'm saying. So, here, where you're having, where you're suggesting that there's knowledge, this is nothing more than, if you have a company that conducts due diligence, then, and you have a highly regulated company, which First Alliance was, in 17 states with regulators, and none of which pulled its license during the time that it was being funded by Lehman Brothers, and being scrutinized by insurance, and being, you know, all of these things are occurring during the time of the, but there are lawsuits, and the lawsuits, the actions, and the lawsuits are going both ways. In some instances, the courts are siding with First Alliance. In some instances, the lawsuits are siding against. We've moved away from the legal theory now to the sufficiency of evidence. And, frankly, my take on the case is probably closer to yours, because it struck me as a factually thin or an evidentially thin case. But here, our standard of review, basically, we've got a jury verdict, and we've got a judge's finding of the fact. And applying the clear air standard, or the comparable version for a jury, can it be said that there wasn't enough evidence to support that jury verdict or that finding? That's a much harder test for us. Well, I think that the problem on the, that's why I was saying, I think that on the substantial assistance is a much cleaner way to go, because on the substantial assistance, you have to show some conduct, which is in line with all of the cases, including the cases cited by the class, which shows either a misrepresentation. It doesn't have to be a misrepresentation to the borrowers. I'm not suggesting that Lehman had to have done, perpetrated the fraud. But it either had to have developed the deceptive sales practice, trained the loan officer, somehow been involved, made a representation about FAMCO, what a great company it was, how you should invest, something. Whether it's the Nielsen case that the class relies on, in every one of those cases, whether it's Woods versus Barnett, any of the plaintiff's cases, the banks are doing something. They're making a misrepresentation. They're repeating. Even the Ninth Circuit's Levine case, the security specific, was repeating misrepresentations. Every time a bank is found to have aided and abetted, they did something wrong. They either repeated the misrepresentation, they had contact with borrowers, and what I'm saying is, here, there's nothing. And in each of those cases, what they do is they infer the knowledge from the conduct, the wrongful conduct. And here, you don't have that. So if you find, if you uphold this verdict, what you're saying to every bank is that if you do your due diligence, and if you find any possibility that the company that you're lending to has had some problems, that somebody later is going to say, that when we look back later, that they were liable for this or guilty of that, and then you're going to be held liable. And so all of these companies, whether it's Coca-Cola or Microsoft or whoever, who hasn't been sued, who hasn't been accused, whether it's a... What's our alternative? I mean, I understand what you're saying, but it seems to me, unless you say, okay, you're a safe harbor, we're not going to be concerned about what you know, then inherently you have that risk of a jury or a finder of fact determining after the fact, looking backwards, you should have known. That's a risk in our system inherently. But do we create a safe harbor? Do we say lending by itself can't be the basis for liability? No, I'm not suggesting that. I'm not suggesting that. So where's the line that we draw on? I think the line is that you have to have conduct. Because I just said lending by itself. Are you saying it can't be? And you're saying you have to have conduct. You're suggesting it has to be lending plus. It has to be some... Can it be just lending? It has to be some wrongful act. So you're saying lending by itself can't be enough. It has to be lending plus. Right. What about lending with knowledge? Knowledge is not conduct. You have to do something wrong. How can you be liable? This is a public corporation that has to file with the SEC that says it has been liable for fraud. Aiding and abetting is not something different. It is a variation. It is secondary liability for fraud. To say it is liable for fraud without having done one illegitimate wrongful act is not right. Well, then the question becomes, can bankrolling a scheme be enough by itself? You've said lending can't be. I've now changed the term to bankrolling because it has an insinuation attached to it. And it seems to me in other contexts, financing unlawful conduct can be the basis for a finding of unlawful conduct. Why is it different here? I understand the risk to banks. I understand we're putting risk on banks of having second-guessing after the fact. But our legal system is institutional second-guessing. If a bank has actual knowledge, unquestionable knowledge, lock certain, not an evidentiary question like here, everybody coming back from due diligence says this is a loan-sharking operation and they've got a drug business on the side. And the bank continues to lend. Do you say just because all they do is lending and they're not doing the loan-sharking themselves, they're not doing the drugs, they're not doing the prostitution or anything else, is the bank in a safe rubber because it's not doing anything more than lending? Based on the law that I've seen to date, I have not seen a single case, and I have seen the cases that say knowledge is insufficient. I don't see anything that says anything differently. What if the bank gets a higher than normal return? That's not what happened here. I'm just asking the question. In the ordinary meaning of the word, aiding and abetting, it does seem like Judge Clifton's example is a pretty tough one, isn't it? It's pretty tough to conclude that a bank was not aiding and abetting illegal activity when it knows the activity is illegal and it continues to offer it loans. But here's the thing. Aiding and abetting what? Aiding and abetting the fraud. The fraud is the deceptive sales practice. What Judge Clifton is saying is the credit line aided and abetted the providing of the mortgage. The mortgage itself is not illegal. It's the fraud. The fraud is the deceptive sales practice, and that's my problem. While the mortgage, yes, the credit line helped and the financial services helped with the mortgages, but mortgages are not illegal.  Let's take our loan-sharking operation. Money is not illegal, and I can lend money to somebody. That's perfectly legal. If they take the money and conduct it in loan-sharking or use it to buy drugs and have a drug ring, that's the activity that's illegal. But because I'm the bankroll, am I allowed to say, but I didn't touch the drugs? But drugs are – an illegal drug operation is illegal in and of itself. There's no legal part of it, if you will, okay? But a – And that's sort of why I picked it. Right. Because if we're willing to attach criminal culpability to being the bankroll, it seems to me the argument that somehow you can't have civil liability is a tough sell. But you can't think that you have a legitimate basis or purpose for lending to an illegal operation. This is not an illegal operation. This is a business. I'll put the criminal defendant in that case. Oh, I thought it was a legal business. You know, it was a front. I was fooled, too. And if the jury decides no, then the bankroll goes down. Layman's saying here, and I understand with good evidence and good reason to believe they're speaking truthfully, we didn't really know what was going on in the fraud. We had the suspicion maybe, but the suspicions were dissipated, and the states hadn't actually shut them down, and the lawsuits were going both ways. So we didn't know. And I understand that as being a perfectly legitimate defense. But the jury defines, yeah, you did know. And if they did know, why shouldn't they be held culpable? If you can be held criminally culpable for bankroll plus knowledge, why can't you be held civilly liable for bankroll plus knowledge? Well, before I run out of time, let me tell you why. First of all, we didn't get the intent jury instruction we should have gotten. As I said, this — I was going to ask you that. Talk about the jury instruction. Yeah. I mean, this is, you know, aiding and abetting is secondary liability for fraud. If you look at BADGI, which is the California jury instruction, and you look for fraud, there's an intent instruction. We asked for an intent instruction that said we were required to — that jury was required to show that we intended to aid and abet or substantially assist the primary. That was denied. How can you hold us liable for aiding and abetting without an intent? I mean, it's a lesser requirement or a higher — excuse me — on a different standard than a primary. It's the same — they're both fraud. I mean, just because it's aiding and abetting doesn't mean it's a different tort. It's the same — it's just a secondary liability for fraud. It's still fraud. So, there has to be an intent jury instruction. So, that's got to be reversible error. That's what I thought you were going to start with. Yeah. Sorry. All right. The other — I guess what I consider the other easy one is reliance. I mean, under California law, the class is entitled to a presumption of reliance when they have a uniform script. They got a class certification based on a uniform script. The problem was their script didn't have a misrepresentation. Their case was based on oral misrepresentation. So, the class should have been decertified. It wasn't. So, they are not entitled and did not — could not and did not satisfy the reliance element of their claim. They also didn't satisfy the damages element. They did not prove damages because they submitted and argued the wrong measure of damages. And then, over our objection, the judge gave the wrong instruction. Let me ask about that situation. This is a peculiar situation where you have a jury verdict which the judge himself, while trying to rationalize it, says it's implausible to believe that the jury followed the rationalization, that there's just no way around the fact you've got an exact averaging of two numbers, one of which is based on a theory of damages which the judge, unfortunately too late, decided was out of bounds, wasn't appropriate. And I so far haven't encountered — and usually we're really loath to get into how jury calculates damages, but I haven't encountered precedent that speaks to quite that situation where you have two calculations put in front of a jury, one of which shouldn't have heard, and it comes out with a conclusion that averages those two. What law speaks very directly to that situation? Or are we stuck in a new territory? We don't have anything. I figured if you had it, you would have given it to him. Maybe he's found it since. No, we haven't. And frankly, I think the problem is they just didn't know. I mean, when he reread it and he read the correct one, I don't think they — I mean, you know, you have somebody read 37 or however many jury instructions. He reread the whole thing? Yes. And it didn't highlight what was different? No. Right. So I don't think they realized that he — But the jury had the instructions. Yes. They had them in the jury. Yes. I don't know. Who knows? Well, you know, that's our system. And it's the lawyer's system to explain it to the jury. Well, but the problem is we argued and we — he pre-instructed. We asked that he pre-instruct, which he did. Then we argued. Then there was a weekend. Then we came back on Monday morning and he reread with the new one and gave it to them. So we never got to speak to them again. How did the new one come about? I mean, was there argument to him or did he — he came back and said, realized — thinking about over the weekend, realized he'd gone astray and needed to fix it. I believe — So he just fixed it? Yes. And — There was no further argument to the jury? No. And so there was no way that we could come and — Did you ask for further argument? Pardon? Did you ask for further argument? I don't believe so. You see, you should have asked for it. There are a lot of things that I realize now. Well, we all do, you know. Yeah. As to — I have four minutes? You're four minutes over your time. I'm sorry. I was kind of surprised. Well, we gave you drug cases. Ten minutes extra so we could do the same. Good morning, Your Honors. May it please the Court, Larry Gabriel on behalf of the liquidating trustee. As the Court is aware, we present on appeal whether or not the Court erred in — after making its findings that Lehman aided and abetted a fraud, that it refused to equitably subordinate Lehman's claim to those creditors to whom the fraud was directed and harmed, the borrower's creditors of this estate, and whether or not the transactions involving Lehman were fraudulent conveyances. In the case of Multiponus, Fifth Circuit case, 1979, the Court remarked, Where ingenuity spawns unprecedented vagaries of unfairness, the bankruptcy courts should not decline to recognize their marks, nor hesitate to turn the twilight for the offending claimant into a new dawn for other creditors. Such is the case — I'll confess I have no idea what that means, but let me ask a question. All right. Who are we talking about here? Who's the trustee standing in for? The trustee is standing in the place of the borrower's committee, the official joint borrower's committee that brought a claim seeking to equitably subordinate Lehman's secured claim to those claims of the borrower. Who's the beneficiary? Who ultimately wins? Who gets money if trustee prevails? The creditors, which include the borrowers that were harmed by the fraud. The borrowers are actually taken care of as class plaintiffs. Is there really any need to deal with them as via the creditors' committee or via the trustee? No, there weren't. Excuse me. I apologize. No, there weren't. First of all, there's, if you will, certain segments of creditors. There are the borrower creditors in 1999. There are the general vendor creditors, and then there are the borrower creditors, all of which came into claimants before Lehman came on the scene. Well, they don't have any unique claim against Lehman, so they're not part of the class. Why should we be hearing them as via the trustee? Because what happened as a result of the fraud, what happened as a result of Lehman's participation in the fraud, is that there was a diminution in the asset values of the estate, which would have been returned to these creditors. FAMCO was more valuable before Lehman started funding money to it? Yes, it was. How? Because, if I may, the chart that they show, this is a circular transaction. And every time a loan was made by FAMCO, FAMCO created a creditor. The court found that each loan suffered a loss of 11%. And so, to the extent... This is a business that lost money in every loan and made it up in volume, or what? No, it is. They didn't get run to the ground because they went broke. They got run to the ground because they were stopped. No, but they would have been run into the ground had they continued by becoming broke because of the amount of the claims that were building up. Every time they made a loan, they incurred a debt of the borrower. So, therefore, that debt had to be recognized. It created a liability on the book. The debt being the fact that they were subject to being held liable to their borrowers for the fraudulent misconduct? Correct. The court found it was 11%. We analogize it to a Ponzi scheme where you keep paying off and paying off and paying off, and we say, no, that's not the case. But, in fact, it is the case to a degree because of the circular nature of the transaction. Every time they borrow money from Lehman, they made more loans. Well, it seems to me that the class plaintiffs are telling us that if Lehman doesn't lend to FAMCO after Prudential walks away, FAMCO is out of business. Correct. Well, now you're telling us FAMCO is even more out of business because Lehman keeps lending to them, and there's a disconnect there. FAMCO is not enormously valuable when Lehman steps in because FAMCO is out of business if Lehman doesn't step in. Exactly. They were insolvent, if you will, because they had no more funding. Lehman provided the funding. So, if it stops right there, how do the previous borrowers have anything they're going to collect against? Because FAMCO is insolvent. They have whatever, well, it doesn't mean that there's not assets. No, but the assets are going to be taken up by the other creditors. The assets will be taken up by the general unsecured creditors that when you go to the secured creditor, Lehman is not there. They're not insolvent because of these imagined debts to the previous borrowers because of their fraud. They're insolvent because they don't have enough money to keep operating, disregarding those imagined debts to the previous borrowers. FAMCO doesn't become enormously less valuable because Lehman lends it money. Yes, it does. How? Because what Lehman did was... FAMCO just helped, because Lehman helped drive FAMCO deeper in the hole. Correct. It's already in the hole. I don't understand that at all. Pardon me? I don't understand that at all. That's what you're telling us. I come to a lender and I say, I'm in debt. I need money to operate. This isn't unusual. It happens all the time. The lender says, okay, I'll lend you more money. Well, business being what it is, in this case a fraud, they continue to get liabilities. They got deeper in debt. That happens all the time. This was a bad business operation because of the fraud. And so the fraud kept continuing to grow. And the damages kept continuing to grow. And the losses to the company kept continuing to grow every time they made a loan. So Lehman was giving blood transfusions to FAMCO, the vampire, huh? Absolutely. That's pretty good. I like that. Happy Halloween. Which is excellent. But that's exactly what happened. There wasn't another lender in this country that would touch FAMCO's business operations. Now, with respect to the appeal, the issues before this court, the court having found that Lehman aided and abetted the fraud, then concluded wrongfully that that conduct didn't shock the conscience of the court. How could it not? If Duncan stood up here... I see a lot of bad stuff. It takes a lot to shock us. Well, that is probably true in the real sense, Your Honor. But when it comes to applying the legal principles and the equitable principles that the court must do, there should be things that shock the conscience. And fraud is one of the worst things that can be done in the civil context. Well, as you know, judges are not supposed to have a conscience. I would hope that's not true, Your Honor. But I hear it all the time at these hearings. Well, you may hear that, but I would be devastated to find that out. You never get concurrence these days if you tell the Senate Judiciary Committee you have a conscience. As long as you don't tell your legal position, I guess you could also say you have a conscience, but I'm not sure. If Duncan stood up here and said to the court, aiding and abetting a fraud is a fraud. The test for equitable subordination is a fraud or such other lawful conduct that may shock the conscience. Fraud in and of itself should shock the conscience of the court. How the district court concluded otherwise is beyond me. If fraud doesn't, does not mandate equitable subordination of a claim, what does? When we even came into... Well, not very much. I mean, that's part of the principle. Equitable subordination isn't applied that often. That's true. It's not a routine remedy. That's true. It is not. And the courts look to egregious conduct. But when they use the term egregious and gross, they use it in the framework of a lawful conduct. Fraud is not a lawful conduct. It can't be a lawful conduct. It is a separate independent tort, which the court has recognized. Can you have fraud without an intent to defraud? You can have aiding and abetting a fraud without the intent to commit defraud. That's what the prima facie element of that particular tort is. Say that again. In aiding and abetting a fraud, you're aiding and abetting the actor. The issue is what did you do or what did you know? Well, in this case... Well, you'd have to know that the actor was committing a fraud. You'd have to know the actor was committing a fraud to get to the point that... I'm running out of time. I would like to point to the Court's attention. The case of Modal Imperial, which is cited in R3, it's 250... But you're aiding and abetting a fraud. Aren't you intending to defraud? You are intending to help the person, the result of which is defraud. You have to... You have an intent to defraud the ultimate consumer. You could say that, yes. The Court has previously questioned whether or not Lehman had to know about the end result and what significance that is. The case that I cited to the Court is one which discusses that issue. And in that case, which was both an equitable subordination case and a fraudulent conveyance case, the Court found where the bank knew of the fraudulent purpose of its borrower, that it could not put blinders on those circumstances and, therefore, not have its conduct questioned. Which case was this again? I won't be surprised to learn that they're sort of blurring together. It's called In Re Modal Imperial Inc. 250 Bankruptcy 776. 250? BR 776. 776. Right. It's a 2000 decision. Modal, huh? Modal, isn't it? Pardon me? Modal? Modal, M-O-D-E-L. Oh, I thought you said noodle, modal. Okay. My time is quickly dwindling. I'd like to reserve the last three minutes. Thank you. Thank you. Richard Scruggs, may I plead the Court on behalf of the class plaintiffs. I'm going to use half the time allotted to the class plaintiffs, and my co-counsel, Mr. Brazier, will take the other half if that's acceptable to the Court. I'm sorry, I have a bit of a cold, and so my voice is not quite what it usually is. The reason that both the class and the trustee are seeking the subordination of $83 million that Lehman Brothers took from FAMCO post-petition is because Lehman Brothers, as we see here today, and if the status quo prevails, will be the only party who has more than made whole. There will be no consequences financially to Lehman Brothers. Financially. They're facing a judgment. If status quo, if the district court's judgment is affirmed, there is a judgment against them in favor of the class plaintiffs. There is a $5 million judgment against them under the status quo, $5.1 million against Lehman Brothers if the status quo prevails. They made far more than that during the period of this process in profits. They would gleefully pay $5 million to walk out the door. They're coming out way ahead. It's ringing the dinner bell to fund predatory lending schemes if that's allowed to stand. The calculation based on the 10% level that was attributed to them. Well, that was an incorrect instruction as well, and we objected to it strenuously, and having the apportionment, the KPRO apportionment on that instruction. It should not have been. This was a specific intentional tort. Lehman Brothers was the only defendant there, and to put a bunch of empty chairs on the jury forum was incorrect. This probation is going to address that issue. Not one of the class, by the way, I'm just looking, is a smaller subset of the creditors generally. It's only those borrowers of FAMCO who borrowed in 1999 and up through March 23, 2000. The persons who allegedly or it is determined suffered from the fraud which Lehman aided and abetted. That's the claim that's been put forward and the claim in which the class plaintiffs have prevailed in the district court. That's right. Other previous borrowers from FAMCO were not victims of the fraud which Lehman aided and abetted because Lehman wasn't lending money before. That's correct. So I understand it's a smaller group. I'm not sure why that's significant or why the larger group has much of a claim. They don't have the same claim. They have an equitable subordination claim, but as we've briefly discussed, that's a sparingly applied remedy. I think it's sparingly applied because it is sparingly sought. It should be. I used to do a lot of Chapter 11 work 20, 30 years ago when I first started passing law, and I tried one of those cases and defended the Fifth Circuit, a subordination case, and we were successful in doing that, but it's rarely done because it's rarely sought. I think that's why there's a paucity of case law on subordination. That was the NRA fabricator's case. I can't give you the site now. It was in the late 1980s. In any event, specific intent. Let me go to the instruction, if I might, that counsel was referring to was inadequate. This is directly from the court's charge, the court record, to the jury. To find that Lehman substantially assisted the alleged fraud by First Alliance, you must find a significant, active, and knowing participation by Lehman in the fraud. If that's not synonymous with specific intent, I don't know how to define it any other way. Specific intent. This court has held, and I think it was Rocha v. Spivey or Spivey v. Rocha. I may have gotten it inverted. Judge Ferguson was on that panel, I believe. Which one was that? I'm sorry, sir. Spivey v. Rocha. It's a reported case. I'd like to know who's reading my stuff. We try to do our homework. Sometimes we miss something. You're from Oxford, Mississippi, aren't you? Yes, we are. And recently from Pascagoula, unfortunately. So I think that's where I've got whatever it is I have here. My law partner, by the way, Judge Spivey, is one of your former students at LSU. And I let him come to Oxford, but he had to be incognito. And you know how those passions work. You know a lawyer down there named Tom Matthews? Tom Matthews? I don't know a lawyer named Tom Matthews. No, sir. And where is he? That's all right. Go ahead. The specific active in knowing participation, that was the phraseology in the instruction that was given? It says, yes, you must find a significant active in knowing participation by a layman in the fraud. That was the instruction given to the jury. And that's what the jury found. I'm sorry, I'm trying to figure out where we are in the argument. You're criticizing that, or do you think this is a good thing to do? No, I'm supporting the court's instruction on that issue. I think the jury was adequately instructed. They did take the instructions back to the jury room. And your argument is that having found a specific active in knowing participation in the fraud, then it follows that we ought to have equitable subordination. Well, that and all the other elements, but that alone should be enough. I thought you were saying that that instruction was tantamount to an instruction that the jury had a fine intent to defraud. No, sir, I'm sorry. I'm going to say, if I said that, what I meant was, or I hope I said was, that that specific intent is not a requirement of the law, but this instruction would satisfy were it a requirement. Oh, okay. Well, that's what I thought you said. Counselor, is there any suggestion in the cases that the justification for equitable subordination in a bankruptcy case ought to turn on whether the fraud was to defraud the bankruptcy, as opposed to a fraud directed someplace else? I think it's inequitable conduct, and that's a pretty broad umbrella, I will admit. But I don't think it is that narrowly limited to defraud the bankruptcy estate or something like that. Are there cases in which the fraud was directed someplace else? Is there any analogy? What's your closest case to the situation? I don't have one offhand other than the one I mentioned to you before, where the fabricator's case, which was reported in the Fifth Circuit back in the late 80s. This is the trustee's argument, not exactly mine, but that's the one I know of, and that was the case where a closely held corporation was loaned money by a shareholder who tried to secure his own lending to the company by notes and pledges on the assets of the company and tried to stand in line ahead of all the other creditors by virtue of that lending. And he was subordinated to the status of a general creditor and not subordinated beneath general creditors. That's what happened in that case, because he was a participant in the business itself and essentially an insider. In this case, Lehman Brothers did the due diligence that you mentioned, Judge, in 1995. Exhibit 28 speaks volumes to what Lehman found out, what they knew. Ms. Duncan's characterization that they found no fraud was explained by the man who wrote this on the witness stand, and if you read it in context, it's pretty clear as well, that when he said there's no fraud, he meant in the actual, because FAMCO didn't purchase mortgages from another lender, they might have been fraudulent. There was little chance of FAMCO originating loans that were fictitious or fraudulent loans, not that they weren't engaged in fraud. The rest of the memo speaks to all of that. There is some concern here, though, because it sets up a situation based on the fact that the legal system works and after the fact review that an ignorant fool may be in a better position than someone that digs around and looks for everything in the corner and gets a mixed bag results. Rarely is a response from an investigation 100% white or 100% black. You get a mixed sense and you make a judgment there. And it almost discourages looking into the corners or investigating thoroughly, doing serious due diligence, if in fact something that a discordant note that is found in 1965 or 1995 can 10 years later be waved around as evidence where you never should have done that. If they had really known about the fraud, it seems to be unlikely that Lehman goes forward because they're afraid that the borrowers don't pay back the loans, and as a result all these securitized, the mortgages that they've resold on the secondary market are going to go bad, and that's going to come back to haunt Lehman there. And so that's probably what they're more focused on, but there's an assessment made, all things considered, that that's not a risk that should deter them. Well, okay, now 10 years later we're second-guessing that. Aren't you concerned about the largeness of this? This is not Monday morning quarterbacking. This was prospective on the part of Mr. Hibbert. Exhibit 28, dated in 1995, was the vice president of the company. He didn't say don't do it, and when they did their more serious review, or their second review, whatever, a few years later when they actually started lending the money, nobody said, it appears, don't do it. This is going to come back to haunt us. Their judgment was, well, it's a mixed bag here, but, you know, it's worth going forward. Well, their judgment was to pursue vigorously FAMCO after this memo in 1995, to extend them a $100 million warehouse line of credit. See, Lehman wouldn't be stuck holding the bag on these securitized transactions. They sell that into the bond market every 90 days. Oh, they sell it, but selling it doesn't mean you've waged it goodbye and it'll never come back to haunt you. Not only would they get a bad business hit for having sold something that turned out to be bad paper, but they've got lawsuits from those people, too. Nobody knowingly goes into a transaction where you think the house of cards is going to come down and the money doesn't get repaid by the borrowers. It just doesn't make sense for Lehman to do that. No ordinary and typical lending facility would do that. That's what makes this case so unusual. I mean, First Union, Prudential, all the other funders of this operation dropped them like they were radioactive. Do we know why they dropped them? There was some testimony about why, and it was mainly because of the increase in lawsuits by attorneys general. Seven state attorneys general. Okay, but did they drop them because they thought it was an economic risk because of the lawsuits, or did they drop them because they were afraid that they might be convicted of aiding and abetting in a fraud? Well, I don't know the answer to that. There was no testimony or evidence as to why they were dropped. But they were dropped, and what is clear is that Lehman was the only game in town, and I think that's a quote from Mr. Chizik, that after everybody else had dropped them, they were going to have to close the doors. None of the loans to our class members, not one, would have been made but for Lehman Brothers stepping into the breach here. But that still doesn't explain why Lehman would make a loan going forward if they really thought that it was a house of cards. I think they just were willing to take the chance. That's all I can say. Let's assume that's true. That suggests that their judgment is the house of cards isn't going to fall down, that it is not, in fact, a fraudulent operation. Do they have knowledge? I don't think you can make that assessment from reading their internal memoranda and from the testimony from their own witnesses. They knew exactly. Their vice president says, I want to take a shower after meeting these guys. Yeah, a lot of things about subprime markets are going to produce squeamish feelings by people who think they're white shoe. It's a different world. They don't like the flavor of it. The risk is that the business model collapses, and the business model can collapse for multiple reasons. The one that would most be apparent to me is that the borrowers don't pay the money back. The second big risk would be that whether the borrowers pay or not, the state shuts them down, and the operation comes down that way. Neither of those are out of layman's anticipation. I mean, they must be making calculations as to whether that's going to happen. They took a gamble. And they conclude that it's not going to happen. It's a gamble worth taking. But that kind of suggests that they don't have the knowledge or belief that's sort of inherent in this aiding and abetting. They don't really think it's a house of cards that's going to come down. I don't think they appreciated the risk to them from doing this. But certainly Prudential and First Union and the prior financiers of this operation must have, because it was lucrative lending business for them, too. And the reason Churchill was alone, that doesn't mean he was wrong. So they're alone. No one else, according to the testimony of trial, no one but Lehman Brothers, not a single financial institution or mortgage lender, whatever you want to call it, or institutional lender like Lehman Brothers or Prudential or anybody like that, not a single one would do what Lehman Brothers did. That was the testimony of trial. Not a single one. And I can't for the life of me imagine why they did it. I think they just thought they could get away with it. If I could reserve the rest of my time, and I don't want to eat up my co-counsel's time if the Court doesn't have any other questions. The return that Lehman was getting on the loans and then the paper in selling it, was there anything extraordinary about that? I think the return was probably ordinary, but it was profitable or they wouldn't have been doing it. So they made more money than the $5 million allocated in the judgment. If they knew that they were taking a chance and this was risky, then they would have asked for a greater return. And I think they did. And that's one of the reasons that Trust Alliance used the other institutional lenders. I thought you just told me that the return they got was nothing extraordinary about it. I don't think there was anything extraordinary about financing a subprime lender in the rates that Lehman got. All I'm suggesting to you, I think, is that Lehman is today whole, whereas no one else is. And yet they were found by a jury and a judge to have aided and abetted fraud. And they walk away with $83 million from the estate. They get to isolate themselves from the activity of FANCO improperly. And they don't get exposed to punitive damages. And I think that is error. And this Court can correct that, of course, but I think it is error and it's ringing the dinner bell to fund these types of operations. Lehman itself, Mr. Hilbert, in that 1995 memo, said that this company was the used car salesperson of subprime lending. Used cars is very valuable to those who need used cars. These people mostly didn't need these loans. These were targeted by telemarketing, a very, very cynical and crafty scheme to identify people who were older and who had lots of equity in their homes. And they were pursued by First Alliance relentlessly. That's in the memos that Lehman found out during their own due diligence two times. But isn't that going on all over the country today? Unfortunately, it is. It's interesting every time you turn on the radio or look at television, there's another ad for a mortgage company. All I can suggest, Your Honor, is that Lehman Brothers itself concluded that these guys were the most extreme, the bad actors of the bad actors. And this isn't just lending to people that can't borrow money easily. This was, I don't know how to describe it. It's a loan truck. Their interest rates are lower than credit card interest rates. The whole credit card business is built on people that don't repay and so carry heavy interest rates. But most people have credit cards in their pocket and most of them don't pay off every month. That's just how people lead their financial lives. Actually, the half-life of these types of loans, and this came out of his trial, this is in the record, is about five years. Before somebody else comes along and talks him into refining yet again to try to get off him under this debt. So there's no chance. The rates over the four or five-year half-life of these loans is enormous. With these hidden 14, in some cases north of 20 points for charging these borrowers. Who were hoodwinked by these so-called loan counselors is what Fanco called them. They were virtually all used car salesmen. That they had trained for 30 days and dusted them up to look like loan counselors and bankers. Well, maybe they'll become attorneys next. I'd use my time up if I could allow Mr. Brazier, if you could please go ahead. I hope your law practice in Pascagoula will be revived. We're up and running down there, Your Honor. We're in law business. We sure didn't expect them all. Good morning, Your Honors. Elizabeth Cabreza also for the class plaintiffs. I'm going to address the error on the verdict form, which resulted in a direction to the jury without instructions of any kind from the court. And I'm going to focus on apportionment of damages among Lehman, the only defendant in this case. And others, including Fanco and the unnamed members of the quote first alliance board of directors. The jury instructions were fine as far as they went. They were certainly more than adequate with respect to aiding and abetting liability. And we have no quarrel with them. However, what happened was the court apparently felt bound and determined to enforce a bar order, a KPRO order, from another case involving a larger class. In a case that did not involve any KPRO claims, our case, no federal claims, no securities claims, and involved an intentional tort claim against a single non-settling defendant. The jury was not told what to make of question five, I believe it is on the verdict form. It was just a box. And they were supposed to add up to 100% and allocate percentages of responsibility. First alliance, the quote first alliance board of directors, Chizik, quote individual loan officers were all put in one box. Lehman Brothers were put in a second box. And NBIA, not involved in any way and not really involved in the trial at all, was put in the third box. The result of this was, the point of KPRO was that a settler should be able to get out of a securities case, pay a fair amount of money, not worry about having to be chased afterwards by non-settling defenders. And the non-settling defenders, when they go to trial, would be able to point to the settling defendant as an empty chair and say, it was his fault. But the issue here isn't whether KPRO applies as a matter of law. The issue is whether KPRO applies as a result of the stipulation that was entered into in connection with settling the bankruptcy and the other settlement. And it appears to be as a matter of contract and agreement amongst the parties, including the class plaintiffs, that there would be this form of determination of a proportionate share of liability. Not so, Your Honor. And not quite. And this is important. The brief that was filed in support of that order made a distinction between KPRO apportionment and what would happen if contribution or indemnification among joint tort feasors were recognized under California law on the state claims. And it correctly stated in two pages, at two points, the California rule, which is simple offset or credit. That's under CCT Section 875. New court securities litigation cited in that brief, the Central District of California case, explained that in a case involving mixed federal and state claims, you apply KPRO to the securities claims or the federal claims. And you apply this straight credit to the state claims. So there was no problem at the time with respect to this bar order because no one on the class side thought that if and when the case ultimately went to trial against Layman on aiding and abetting fraud, a California state law intentional tort claim, this bar order was going to spring up to require this sort of allocation, even if under California law, Layman were entitled to some offset. And the controlling California law says, no, if you're an intentional tort feasor, you don't get contribution or indemnity. Very clear. But even if they had been, what they would have been entitled to at most was a straight offset. There was testimony by Layman's damages expert, Dr. Karen, at trial that the people in this class, a very small subset of the people in that settlement class, were getting approximately $15.8 million out of that settlement. Now, that estimate turns out to be high, but let's take it as correct because the jury had that piece of information. The jury could well have credited that amount fully. Certainly reasonable to assume that went into the calculation. That was a piece of data they had. And assuming that Layman was entitled to that, which we say they weren't, they got that credit. So even if the entirety of this verdict, the $50 million verdict, should be reallocated to Layman only, and we say it should be, they already got the legitimate legal benefit of that KPRO order under its own terms. Now, that's assuming they were entitled to that offset under California law. We cited all the cases from the Ninth Circuit, from the California courts that say they weren't. And that also assumes that they timely raised that offset as a defense, which this bar order says they had to do. It said you can assert it as a defense. Layman has an answer. It's in the record to the operative class complaint. It's got a lot of affirmative defenses in it. It doesn't have this one. It never raises the issue. The final pretrial order, which was entered two days before the trial started, is in the record. It goes on for pages and pages. It lists all the issues, all the claims, everything. It doesn't mention this. There's Ninth Circuit case law, and I believe, Judge Pregerson, you were at least on the panel that decided this issue more than once. But under Rule 8c, you've got to plead affirmative defense. You can have a little leeway. Maybe it doesn't have to come up until the final pretrial order. But if it never comes up and the other side can't deal with it and can't attack it, then they're prejudiced. Well, I guess I'm confused here. We have a — I'm confused. It's hardly exceptional, particularly given the quantity of issues and so forth here. But I look at the bar order, which was entered by the very same court previously. It's not like this bar order is out in Venus someplace and nobody knows about it. And it's not an issue — the effect of the bar order is not an issue for the jury. And so why is it that we're expecting this to come up as part of the pleadings or the final pretrial order or anything else? This is something the court's going to apply later. If by its terms. Now, I think one of the problems here, quite frankly, might be because the bar order was very familiar to Judge Carter. And he's presiding over all this litigation. And he might — and I don't like to psychoanalyze judges — he might have had it in his head that it was going to apply. But — When I look at it, frankly, it seems to me it does apply. But, Your Honor, that's the problem. It doesn't apply unless it can apply by law. Judge Carter wasn't entitled to make the law. No, no, no. Let's look at the key paragraph. The amount of any verdict or judgment obtained against any of the non-settling defendants in any litigation arising out of or related to — it doesn't say security claims uniquely. It doesn't say Federal claims. It doesn't say a certain kind of litigation. It says any. Five or six times through this paragraph. Your Honor, it also refers to — it also refers throughout to KPRO. The brief that supported that order, that sought that order, was clear to say that with respect to California claims, there was a different system. And at the time that order was entered, the case that went to trial the next spring was part of litigation involving not only laymen, but at the time, a larger class. At the time, Prudential. At the time, First Union. And there were mixes of Federal and State claims in those complaints. There were RICO claims. There were Truth in Lending Act claims. There was a mix of claims. Such that the litigation looked like the type of case, a mix of Federal and State claims, in which the KPRO plan would apply ultimately to the Federal claims. And as in Newcorp, the case the proponents of the bar order cited to the court, the State law rules, which are statutory rules of contribution among tortfeasors, would apply. So the class had no reason to ever suspect that KPRO would spring up at the trial. Now, we would have known if Lehman had done what the bar order said it had to do, asserted as a defense. If Lehman had said in its answer, okay, we get the benefit of this bar order under KPRO, even though it's not California law, and we get proportional allocation, we would have then said, oh, no, you don't. The bar order doesn't make new law. Federal common law doesn't apply here. You might get KPRO on Federal claims. We don't have any of those against you. But you can't have it here. And we could have hashed it out. And quite frankly, it could have come up to this Court on an appeal if it were contested. But that didn't happen. It doesn't get raised. Not our job to raise it. It's the job of the beneficiary to raise it. They don't raise it. But the judge didn't raise it, Your Honor. The judge didn't raise it until we were in trial. But it's not a triable issue. The application of this is something done by the judge later. The proper application of the bar order to impose proportional allocation on a California claim that is an intentional tort, that decision by the judge was an error of law. And you can argue it as such. This notion of notice or layman didn't plead it, that's what has me mystified. Okay. It seems to me this is an issue of law. Right. Which the judge applies after he gets the verdict. It could be argued that that 10 percent number doesn't mean anything. That doesn't limit liability. And you're arguing it. And that's what we're arguing now. And you're absolutely right, Your Honor. This Court can rectify the situation, can correct this error of law by simply amending the judgment so that there is no allocation. And I apologize for confusing the Court. My point was not only was it error as a matter of law to – for anyone to have done this. You're right. The jury could have been told nothing about this and the judge might have after the fact decided I'm going to allocate it that way. That would still be an error. The error is compounded because the jury is told to do something. They're not told how to do it. They're not told why to do it. They're not told under what law they should do it because there is no law. Lehman proffered one jury instruction on this point. It was their jury instruction number 31. And they took it from Bagi, 1491. And they called it Guidelines in Determining Comparative Negligence, which isn't in the case. The Bagi use instruction says you can't use this instruction in an intentional case because you can't do this sort of allocation. The judge, to his credit, didn't give this instruction. It would have been patent error to do so. It didn't apply. But the judge gave no instruction to the jury, simply adopted the verdict form. And the result of this verdict form was the poor jury sitting here trying to apportion responsibility and damages among folks it never heard from at the trial and didn't even hear about at the trial. This was pointing to an empty chair that wasn't there. There were no empty chairs in the courtroom for the board of directors. There was no ability for the jury to do this. So the only just and fair thing, either as a matter of law or as a matter of equity, both of which are involved in contribution and indemnity, is to impose the entirety of the liability against Lehman. This was a verdict form that should never have gone to the jury. There are a couple of things I want you to address, and we're way into deficit spending, but that's okay, because other cases are being submitted today. With regard to damages, separate element of damages, which you actually arranged earlier, we have what seems to me to be a peculiar situation, because the jury is presented with two separate calculations by separate experts, and the judge at the end of the game decides that the system or the theory applied by the plaintiff's expert is not appropriate. We have a jury verdict that comes back after that, the average of the two. Is there any authority that speaks to it? I'll give you the same question I gave Lehman. And what do we do with it? Indirectly, yes. I think if there was error there, and we don't believe there was, it now turns out to have been harmless error that does not need to be corrected by this court. Why? This year, the California Supreme Court came out with a decision called Robinson Helicopter. I don't have the site. I'm sorry. It's not in our briefs. It's a new decision. It affirmed damages, including punitive damages in an economic transaction fraud case, and one of the things the court said in Robinson Helicopter was that both benefits of the bargain and out-of-pocket damages remedies can be appropriate in a fraud case. So I think if there is any error there, and we don't believe it is, this decision by the highest court in California on a matter of California law and damages creates harmless error. We think that it is just as reasonable to presume that among the things the jury was doing in its 19 days of deliberations was crediting Lehman for the amount that FAMCO had already paid in the settlement because we had the specific amount on that. If that is what they did, then the surest way to cure any error is to hold Lehman liable for the entirety of the $50 million. It's more than fair to Lehman. It's less unfair to FAMCO. I suspect Lehman doesn't view that as more than fair to Lehman. Your Honors, as has been pointed out, Lehman took $82 million out of his bankruptcy. Put $77 million into it. They made a little money. So if they pay out $50 million, I doubt that Lehman is going to find it more than fair. So they've already made back more than the jury verdict as it stands. They also made in the few months before the bankruptcy $2.2 million plus $2.2 million plus $4.5 million. They made securitization fees. They made now we're doing business together fees. Let me ask you another question, different topic. Yes. California Business and Professional Code, Section 17200. It's talked about in the briefs, haven't talked about it, and I understand it's less important. But I'm sort of mystified as to what difference it makes at this point. Because as I understand it, it leads to injunctive relief, which doesn't really seem to be much on the table. Is there something there that would support a monetary award? There is disgorgement of women's profits, and that is a classic UCL remedy. We haven't spent much time on that because we're not trying to overreach here. We want full recovery. We don't want double recovery. But the fact of the matter is that the Casey v. U.S. Bank case, which Raymond proffered to your honors in a letter brief back in April, deals both with aiding and abetting, and we meet those standards under Casey, which is the newest California case. And it also talks about aiding and abetting being equivalent to a 17200 liability if the knowledge element is met as it is here. So we're certainly on firm ground to ask for 17200. The other thing that's interesting is I'm just on punitive damages, and I'll sit down because I do want to address the point. This court issued a decision quite recently called Hangarter v. Providence, and I believe, Judge Clifton, that you were either the author or on the panel of that decision involving punitive damages in the 17200 case. This was the chiropractor who became disabled. The insurance company yanked the disability policy. The case went to trial. A jury verdict of punitive damages, 2.6 times the economic damages, which were substantial, and affirmed by this court in the post-State Farm v. Campbell decision. That case supports us on many, many grounds. There was certainly notice to Lehman that economic transactions, if they're done knowingly and if they're reprehensible, can result in severe penalties. That's what BMW v. Gore says, State Farm v. Campbell, in this court in Hangarter. This court has affirmed 2.6 to 1 in Hangarter. In the Wei Zong case, Judge Predersen, in which you were involved, it was a 7 to 1 ratio, economic damages, but in the context of employment discrimination. The court below didn't let punitive damages go to the jury. Maybe the court was jaded, maybe its conscience wasn't shocked, but it was the jury that was entitled in the first instance to decide what level, what degree of reprehensibility was involved in this conduct of creating a borrower class of people that lost well over $50 million in loans that they didn't need, that didn't have to be made. FAMCO chased them, Lehman chased FAMCO, and we end up with the loss. Your Honor, you could, on appeal, set an appropriate level of punitive damages. On remand from Cooper v. Leatherman, the Ninth Circuit did just that. It was a 10 to 1 ratio on an economic loss claim. In the alternative, you could remand to the district court with instructions for a jury trial on the punitive damages issue only. Those are the three areas of relief we're seeking. To have the judgment rehabilitated, to hold Lehman accountable for the totality of the harm caused by its own intentional misconduct, to reinstate the 17200 claim. Obviously, there will be no double recovery because the court can adjust those outcomes. And thirdly, to either assess punitive damages in this case based on the trial record, which you have under your duty to conduct a de novo review of punitive damages issues, or remand for precise calculation to the district court. Thank you. If I could reserve one minute, and I apologize for going over time. Thank you. I wanted to address the bar order issue. Mr. Brazier said there was no federal claim, but we've discussed the equitable subordination claim, which is a federal claim under the Bankruptcy Act. And under the bar order, you see that the court did rely on Rule 16 and Section 105 bankruptcy code as part of its authority in entering the bar order. So there was a federal claim asserted against Lehman Brothers in addition to the aiding and abetting claim. It wasn't a securities claim, certainly, but there was a federal claim. As to the bar order and why an affirmative defense wasn't asserted, we didn't have an affirmative defense against the class. So why would we couldn't? There was no contribution or indemnification claim against the class to assert. We wouldn't have pleaded it. Besides that, it had been wiped out by the bar order. And more specifically, the bar order expressly said that we should not and did not need to expressly plead the defense in any form on a going-forward basis. So there was nothing. I heard about the bar order was that it wasn't intended to apply to the state law claims. I don't read it that way. There's nothing that says that. And in fact, counsel was referring to the brief and if you look at KPRO and if you look at any of the authorities, including the bar order, it refers to If you look at KPRO, for example, it refers to both 877.6 and federal claims. And so in most cases, you're going to have both state and federal claims as we did here. And I think because I participated, as did the class, in the drafting and approval of the bar order. We wanted to make sure in order for Lehman to lose its right to object to the settlement, the FAMCO settlement, because that's what was happening. We were going to lose our right to object. And the quid pro quo for that was we would then have our potential liability limited to proportional liability on a going-forward basis. And that way, we were not prejudiced by waiving our rights to object to the FAMCO settlement because there was no harm, no foul. We would never be required to pay more or less than was our share. And that makes sense. But if, in fact, what Mr. Brazier says is true, that we would have been entitled to a pro tanto approach, which is the California approach, then there would have been prejudice. And we would have, then we would have had something to squawk about, and there wouldn't have been a quid pro quo. That would have been a very bad deal. And the way Judge Carter, and they say, well, you weren't a party to the bar order, I don't know what that means. Because we were given notice. We were a non-settling defendant. We were identified and referred to in the bar order. Our rights were affected in the bar order. We were required to appear at the hearing. We were required to waive our rights or speak or forever hold our peace. We had a right to appeal. I mean, I don't know what makes you a party to the bar order if that doesn't. We weren't a party to the settlement. That is true. We were a non-settling defendant who had rights, statutory rights, and had interests. So we were definitely a party. Our interests were affected. And as Judge Clifton has pointed out, certainly our interests were not limited or our claims were not limited in any way in the bar order. It was very broad because FAMCO needed it to be very broad. They didn't want only certain claims to be restricted. They wanted to make sure they had the broadest possible protection. The business about the empty chair defense is a little peculiar because the form included the settling defendants. MDIA is listed in the bar order. They were part of the settling defendants. The loan officers, the board of directors, these were settling defendants. In fact, we had asked that they be identified. We wanted to list the settling defendants. And the judge, frankly, did the class a favor because I guess he thought that if he listed them all, it would be a smaller percentage for Lehman. So he grouped them. And I think that probably inured to their benefit. And it's not an empty chair defense. It wasn't that we were pointing to them. In order to prove aiding and abetting, it's part of the class's job to prove the underlying defense. They had to prove that FAMCO committed the fraud. So there was evidence. It was their evidence. And they haven't mentioned judicial estoppel. They are judicially estopped. In order to receive the benefits of the FAMCO settlement, they had to agree to the judgment reduction provision of the bar order. In other words, that Lehman would be entitled to proportional liability, which is called for. They agreed to that. They are now disavowing that by trying to get this court to order, in effect, what would be additive. Under the class's view, Lehman would be required to pay for more than it would have paid had all of the parties gone to trial. As the Ninth Circuit said in Cape Grove, that is not equitable. That should not be sustained. Speaking of equitable, the only thing I want to say about the trustee's equitable subordination claim, equitable subordination is not a cure-all retribution doctrine. As Judge Biden said, excuse me, I think I mispronounced your name. I'm so sorry. Mike. Thank you. It has to be related to the bankruptcy rights. And as Mr. Scruggs said, even in fabricators, it related to that shareholder's attempting to convert what was an ownership interest into a creditor's right. He had an ownership interest that he was trying to hide as a loan. But here, the borrowers aren't complaining about a bankruptcy right. This is wholly independent. And so, I think what the trustee is doing is they're confusing a fraud that was allegedly committed in the aiding and abetting, which is very different than any fraud that is committed on a creditor's bankruptcy rights. So, when you're trying to shock the conscience of a court, it has to be in relationship to a creditor's rights. So, that's why I believe that the district court was correct and should be sustained. Thank you. All right. We're coming to the end of this. You have, Your Honor. I'll try to make this. I'm sorry. I think I had two minutes and 40, now 39 seconds. Larry Gabriel on behalf of the trustee, and I'll speak very quickly. With respect to the bankruptcy rights, all creditors have rights in the bankruptcy to an equal distribution of their assets and according to their priorities. That's the bankruptcy rights that we're talking about. The bankruptcy concept of equity must be applied to adjust those equities when there has been a wrongful conduct. The wrongful conduct by Lehman Brothers created the harm to those creditors that are in the bankruptcy of SAMHSA. They cannot be allowed to get away with getting full payment on their claim, and interest, and fees, while those that suffered from their outrageous conduct are harmed as a result of the failure to get an equal distribution out of this estate. That's what the equitable subordination claim is about. That's what the bankruptcy code says, and that's what the bankruptcy court must do. It's about the equities of the creditors that are before them. The borrowers are creditors. They are no different than unsecured creditors. They cannot be ignored by Lehman Brothers. The fact that this court, that the district court, failed to recognize that, I think, is error as a matter of law. There is no question that the Supreme Court has said that the equity powers of the court can never be extended on behalf of one who has acted fraudulently, who by deceit or unfair means has gained an advantage. To aid a party in such a case would make this court a better of inequity. Yeah, but they're not asking for equitable intervention by the court. You are. No, Your Honor. When a claimant is in the bankruptcy court, they become subject to the equitable powers. They are asking for equity. They are asking for an equal share of the distribution of the assets according to their priorities. That's the equity. So they are inequity. They are all asking for equity.  It cannot be ignored. The principles of equity jurisprudence cannot be ignored by this court. The Supreme Court, again, noted that if the conduct of the claimant be offensive to the dictates of natural justice, then whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be rendered remedialist in a court of equity. Could Lehman have gone and enforced their lien in a court of law? Yes. Against FAMCO, yes, but they can't come into the bankruptcy court in an equity setting and say, no, we're still entitled to those considerations, the law. They have to be subject to the equitable principles of the court. This court asked Mr. Scruggs a question. Well, can a bank just make a loan and not know the borrower? Banking 101 says know your borrower. Know what the borrower is doing. You're not going to allow a bank to get into a fraud. Where the bank knows of the purpose of the loan, that the loan is a fraudulent transaction, that bank must suffer the consequences of its act. Mr. Madonna testified, one of Lehman's officers, when I asked him the question, well, why did you do this? Because that's the question before this court. And the reason that they did it was because they knew of the fraud. They didn't care because they felt that if they were fully secured, they would get repaid by the securitizations of the loans. And they valued the litigation risk. And they said, oh, and then there's insurance to cover that. And, oh, and then we think that there are also sufficient assets to cover it. Mr. Madonna stated, the question was, and that was the concern of Lehman Brothers, not whether or not FAMCO was deceiving the borrowers, but whether or not the cases could come, could be resolved, and there were sufficient assets to pay those settlements so FAMCO could remain a viable company. That was Lehman's concern, wasn't it? Yes, based on the history of the company. So they didn't care. They knew about the fraud. They didn't care. They figured we're going to have that liability covered and we're going to get paid in full. And that's all they cared about. And so they participated in the fraud, and equity cannot countenance a fraud. Thank you. It took you a while to get warmed up, huh? I believe in the claim passionately, Your Honor. Thank you. That's it? We're done. Thank you. All right. Go in peace and the matter will stand submitted. And this court will recess until 9 a.m. tomorrow morning.
judges: Pregerson, Clifton, Bybee